# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| ———————————— ) | | |
| DANIEL E. CARPENTER ) | DOCKET NO: | OCT 13 2022 PM 4:00 |
| *Petitioner* ) | | FILED - USDC - BPT - CT |
| ) | | |
| v. ) | | |
| ) | | |
| UNITED STATES PROBATION ) | OCTOBER 13, 2022 | |
| AND PRETRIAL SERVICES ) | | |
| *Respondent* ———————————— ) | | |

# MOTION FOR IMMEDIATE RELEASE FROM FEDERAL CUSTODY
## PURSUANT TO 28 U.S.C. §2243

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| DANIEL E. CARPENTER | ) | DOCKET NO: |
| *Petitioner* | ) | |
|  | ) | |
| v. | ) | |
|  | ) | |
| UNITED STATES PROBATION | ) | OCTOBER 13, 2022 |
| AND PRETRIAL SERVICES | ) | |
| *Respondent* | ) | |

OCT 13 2022 PM 4:00
FILED - USDC - BPT - CT

## MOTION FOR IMMEDIATE RELEASE FROM FEDERAL CUSTODY
## PURSUANT TO 28 U.S.C. §2243

TO THE HONORABLE STEFAN UNDERHILL, MAY IT PLEASE THE COURT:

NOW COMES THE PETITIONER, Daniel E. Carpenter, *pro se*, to ask this Honorable Court to

order his immediate release from Federal custody based on this Court's inherent power under 28

U.S.C. §2243. Section 2243 provides, in part, "[a] court, justice, or judge entertaining an

application for a Writ of Habeas Corpus shall forthwith award the writ or issue an order directing

the respondent to show cause why the Writ should not be granted, unless it appears from the

application that the applicant or person detained is not entitled hereto." Pursuant to 28 U.S.C.

§2243 and given the irreparable harm that Petitioner's Supervised Release is causing to him and

his family, Petitioner respectfully requests that this Court immediately issue an Order to terminate

Petitioner's remaining period of Supervised Release and release him from Federal custody.

Dated October 13, 2022

Respectfully submitted,

/s/ Daniel E. Carpenter
Daniel E. Carpenter
Petitioner, *pro se*
18 Pond Side Lane
West Simsbury, CT
06092

**NO ORAL ARGUMENT REQUESTED**

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DANIEL E. CARPENTER | ) | DOCKET NO: |
| *Petitioner* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES PROBATION | ) | OCTOBER 13, 2022 |
| AND PAROLE OFFICE | ) | |
| *Respondent* | ) | |

OCT 13 2022 PM 4:00
FILED - USDC - BPT - CT

### MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR IMMEDIATE RELEASE FROM FEDERAL CUSTODY PURSUANT TO 28 U.S.C. §2243

### PRELIMINARY STATEMENT

While doing legal research for an incarcerated friend, this *pro se* Petitioner happened to read the article in Appellate LAW360 that Your Honor is taking Senior Status in November, and Petitioner would be honored to have Your Honor be the Judge that signs his Writ of Habeas Corpus for immediate release from Federal custody pursuant to 28 USC 2243. Petitioner respectfully suggests — and wanted Your Honor's Clerks and extended family to know — that Your Honor is the best Judge in the Tri-State area and New England, if not the whole East Coast. Petitioner also respectfully suggests that he has a rather unique perspective in making that observation as he helped over 180 inmates with their legal filings — and was able to get 120 of them out early under the FSA and the CARES Act. Petitioner is happy to report that he only has two "clients" left in prison — with one of them on the way to Supreme Court in the Session just started. The word "clients" is in quotes because we never charged a "Mack" (Mackerel is slang for the currency in prison), or even a package of tuna or wild salmon for helping people. But we of course did hear (or in some cases read) firsthand how bad the judges were in many of these cases. Judges as fair as Your Honor are rare indeed. In fact, in one case when I was traveling each day from Wyatt to

1

my own trial in front of Judge Chatigny in February and March 2016, Your Honor summarily dismissed all charges against one of my Black drug-using friends (he was not a Dealer), and I was the only one in the Van that evening returning to Wyatt. The Van Drivers said they had never seen any prisoner immediately released as Your Honor did that day — which explains why Petitioner is asking Your Honor to sign the "Sacred Writ" and order Petitioner's immediate termination from Supervised Release as I have served 17 months of my 36 months of Supervised Release and have accumulated more than enough FSA Earned Time Credits — as well as other credits — that should be more than enough to "pay-off" the remaining time on Supervised Release. This Petition is for immediate release from Federal custody and Supervised Release and not to be confused with other petitions that this Court is familiar with challenging my convictions in Boston and Connecticut and the two unlawful raids by the IRS in 2010 and the DOL in 2011. Petitioner prays this Court to beat the two-day record set in *Ex Parte Merryman* which happened during the Civil War.

The Appellate LAW360 article also said that Your Honor was a Rhodes Scholar. Oxford was my favorite venue to play Bridge Tournaments — and as a devout C.S. Lewis fan, Magdalen College was my favorite college. I was the only American on the All-England Bridge Team representing the English Bridge Union (along with partners from India, Wales, Poland, and Switzerland), and because I developed a reputation as the "American" on the English Team — it was quite comical seeing my teammates trying to fake my American "accent" to convince people that they were the "American".

The only reason to mention this is to explain that I attended University in England on an ROTC Scholarship. I was trained by Green Beret Special Forces at Fort Bragg and was a Captain in Military Intelligence at Fort Huachuca in Arizona, which is famous as the Home of Military Intelligence and for Operation Honey Badger that was started after the failure of Operation Eagle

Claw in the desert of Iran. The only reason this is important is that after serving my Country and being a member of USAA for over 45 years — USAA recently contacted me to say they are not renewing my insurance policies (despite my wife being a paying member of USAA for 40 years) because they just discovered that I had a Federal Conviction for Fraud. We realize that we should save that fact for the future Writ of Coram Nobis, but Judge Chatigny has ignored Petitioner's Motion for early termination from Supervised Release pursuant to 18 USC 3583 since it was filed five months ago. Petitioner would like to get a job without the burden of reporting to Probation — but Petitioner has been blessed with the best Probation Officers in the Country and it is his own fault that he was in the Insurance industry rather than the Marijuana business, like many of his "clients" and friends. But Petitioner wishes to recognize Your Honor's great writings, thoughtful decisions, and many contributions to the Rule of Law — and most of all Best Wishes for Your Honor's Senior Status.

## I.        PETITIONER IS ENTITLED TO RELIEF

There is no question that Petitioner served his entire sentence without any of the benefits of the First Step Act (FSA) despite the fact that Petitioner was an over age 60 —White-Collar Nonviolent Elder offender — that should have served only 20 months of his 30-month sentence and received 15 Days off his sentence for each month served. Unbelievably, the BOP transferred Petitioner from the Camp at FMC Devens to a Maximum-Security cell at MDC Brooklyn in November 2019, where Petitioner was in 23-7 (sometimes 24-7 for several days) lockdown due to COVID from March to his departure in June 2020. The historical tradition is that when a "Camper" ends up in a Maximum-Security Facility, the traditional method to compensate the Incarcerated Inmate is to take a month off the sentence for each week that a Low-Security "Camper" serves in a higher security setting. (*See e.g.* Judge Gorton's decision in *United States v. Macfarlane,* 438

3

F.Supp.3d 125 (D.Mass. Apr. 14, 2020) below). November 2019 to May 2020 is 26 weeks so Petitioner should be credited with 26 months off his Supervised Release.

Additionally, when the COVID lockdown ensued, many judges across the Country used the one week for one month off because even "Campers" were under the 23 hour a day lockdown and the suspension of all visits, computer use, and phone calls. The 14 weeks that Petitioner was in pure lockdown at MDC (many days were a full 24-hour lockdown) should give Petitioner another 14 months off his Supervised Release, which is already 40 months off his Supervised Release, before discussing Petitioner's Earned-Time Credits under the FSA.

But Petitioner was over Age 60, and the First Step Act mandated that people over Age 60 should get early release. In fact, Petitioner submitted a detailed 2241 Petition to the Eastern District of New York where Judge Kuntz immediately issued an Order to Show Cause, which is attached as Exhibit One. Suffice it to say, Judge Chatigny denied each and every one of the Petitioner's Motions and Petitioner has clearly exhausted all remedies — which is described in great detail in the Government's Motion to Judge Kuntz to transfer Petitioner's 2241 to Connecticut, attached as Exhibit Two. Moreover, even under the CARES Act, Petitioner has certainly served more than 25% of his Supervised Release sentence as well as over 50% of his total sentence, which should allow this Court to immediately terminate the remainder of his Supervised Release and order his immediate release from Federal custody.

It is also clear from the BOP/DOJ regulations issued in January of 2022 that prisoners would still earn 15 days a month while on Home Confinement, and those credits could be used to reduce a person's period of Supervised Release. The letter to Judge Kuntz by the Government (attached as Exhibit Two) is clear evidence that Petitioner has more than exhausted all of his administrative remedies — but since the decision in this case is one of law and obvious

mathematics there is no requirement for Petitioner to exhaust his administrative remedies. *See e.g.,* *Goodman v. Ortiz*, No. CV 20-7582 (RMB), 2020 WL 5015613, at *3 (D.N.J. Aug. 25, 2020) ("Moreover, because the Court finds habeas relief should be granted, exhaustion is excused.")

Petitioner also respectfully suggests he has a number of Due Process violations such as described in *United States v. Benatta*, 2003 WL 22202371 (W.D.N.Y. 2003) which would also allow this Court to grant relief based on the Second Circuit's decision in *United States v. Ray*, 578 F.3d 184 (2d Cir. 2009), where the Court eliminated the rest of her sentence so she did not need to go to a Halfway House to serve her sentence.

Once again Petitioner does not wish to belabor the point, but attached as Exhibit Three is Petitioner's original filing in 2021 to reduce his period of Supervised Release, and attached as Exhibit Four is Petitioner's filing before Judge Chatigny for early termination of Petitioner's Supervised Release that has been ignored for five months. Petitioner filed his 2255 Petition in November 2021 along with several other briefs for relief under the FSA, but everyone is entitled to relief under § 3583 after serving one year of Supervised Release. The whole purpose of Supervised Release is to help those formerly incarcerated to ease back into society, not for punishment purposes. In his brief, Petitioner cited the famous mobster Ronald Filocomo (who allegedly killed people) and the famous fraudster Roy William Harris (who owed over $100 Million in Restitution) both of whom received relief and had their periods of supervised release terminated in the interest of justice. The irony here is that Judge Chatigny wrote the seminal decision on the ability to reduce a sentence of Supervised Release pursuant to the FSA and Section 3382(c)(1)(B) in *United States v. Page,* 2020 WL 1698671 at *6-7 (D.Conn. April 8, 2020). Petitioner has cited Judge Chatigny several times in briefs for other inmates:

Returning to the First Step Act, I conclude that it authorizes a reduction in a term of supervised release. The First Step Act constitutes an authorization to "impose a reduced sentence." A sentence is comprised of at least two parts: the term of imprisonment and the term of supervised release. *See* 18 U.S.C. §3583(a) ("The court, in imposing a sentence to a term of imprisonment...may include as a part of the sentence a requirement that the defendant be placed on a term of supervised release after imprisonment..."). The First Step Act therefore authorizes courts to reduce both a term of imprisonment and a term of supervised release...This construction comports with the statutory text and the remedial purposes of the First Step Act and the Fair Sentencing Acts. *See Page* at 7, *citing United States v. Simons,* 375 F.Supp.3d 379, 382 (E.D.N.Y. 2019).

Furthermore, the grant of Habeas Relief is perfectly suited to this situation where Petitioner is questioning the calculation of his time in custody rather than the conviction itself, which this Court knows is flawed in many respects not discussed here. But, the Framers viewed freedom from unlawful restraint as a fundamental precept of liberty, and they understood the Writ of Habeas Corpus as a vital instrument to secure that freedom. Experience taught, however, that the common-law writ all too often had been insufficient to guard against the abuse of monarchial power, and history counseled the necessity for specific language in the Constitution to secure the writ and ensure its place in our legal system.

The Magna Carta decreed that no man would be imprisoned contrary to the law of the land. ("No free man shall be taken or imprisoned or dispossessed, or outlawed, or banished, or in any way destroyed, nor will we go upon him, nor send upon him, except by the legal judgment of his peers or by the law of the land"). Important as that principle was, the Barons at Runnymede prescribed no specific legal process to enforce it. However, the Writ of Habeas Corpus gradually became the means by which the promise of Magna Carta was fulfilled. That the Framers considered the Writ a vital instrument for the protection of individual liberty is evident from the care taken to specify the limited grounds for its suspension: "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety

may require it." Art. I, § 9, cl. 2; see Amar, Of Sovereignty and Federalism, 96 Yale L.J. 1425, 1509, n. 329 (1987) ("[T]he non-suspension clause is the original Constitution's most explicit reference to remedies"). The word "privilege" was used, perhaps, to avoid mentioning some rights to the exclusion of others. (Indeed, the only mention of the term "right" in the Constitution, as ratified, is in its clause giving Congress the power to protect the rights of authors and inventors. See Art. I, § 8, cl. 8.)

Surviving accounts of the ratification debates provide additional evidence that the Framers deemed the Writ to be an essential mechanism in the separation-of-powers scheme. In a critical exchange with Patrick Henry at the Virginia ratifying convention, Edmund Randolph referred to the Suspension Clause as an "exception" to the "power given to Congress to regulate courts." A resolution passed by the New York ratifying convention made clear its understanding that the Clause not only protects against arbitrary suspensions of the Writ but also guarantees an affirmative right to judicial inquiry into the causes of detention (noting the **Convention's understanding "[t]hat every person restrained of his liberty is entitled to an inquiry into the lawfulness of such restraint, and to a removal thereof if unlawful; and that such inquiry or removal ought not to be denied or delayed, except when, on account of public danger, the Congress shall suspend the privilege of the Writ of habeas corpus")**. (Emphasis added and Internal quotations omitted))

## II.     THE FIRST STEP ACT

Enacted on December 21, 2018, the First Step Act (hereinafter "FSA") was the result of a bipartisan legislative effort to overhaul the criminal justice system and provide Earned Time Credits for the reduction in sentences for nonviolent elderly offenders as well as other drug-based crimes that receive extraordinarily long sentences. Congress aimed to enhance public safety by

improving the effectiveness and efficiency of the federal prison system with a new Risk and Needs

Assessment Program known as PATTERN, and everyone would receive a PATTERN Score so that

they could be assessed for whether they receive 10 or 15 days a month off for those determined to

be low risk, nonviolent offenders. See 18 U.S.C. §3632(d)(4)(A):

> The Act also makes clear that "[T]ime credits earned under this paragraph by prisoners that actively participate in recidivism or activities **shall be applied to time in prerelease custody or** __supervised release.__ The Director of the Bureau of Prisons shall transfer eligible prisoners as determined under §3624(g) into prelease custody or supervised release." *Id.* Furthermore, under the federal sentencing statutes: "[I]f the Sentencing Court included as part of the prisoner's sentence a requirement that the prisoner be placed on a term of Supervised Release after imprisonment...the Director of the Bureau of Prisons may transfer the prisoner to begin any such term of supervised release at an earlier date...based on the application of earned time credits under §3532." See §3521(g)(3).

Petitioner's sentence included three (3) years of Supervised Release, and therefore under

application of the FSA, the Earned Time Credits Petitioner earned should be used to reduce his

period of Supervised Release. Additionally, §3632(d)(6) provides: "In addition, the incentives

described in this Subsection shall be in addition to any other rewards or incentives for which a

prisoner may be eligible." This Court can remedy that by ordering Petitioner's immediate release

pursuant to §3582(c)(1)(B) based on a change in the statutes or the Court's inherent authority to

issue Writs pursuant to 28 U.S.C. §2243. *See, e.g., Levine v. Apker*, 455 F.3d 71 (2d Cir. 2006),

stating that the District Court has the right pursuant to §2243 to reduce a prisoner's term of

Supervised Release.

Under the Definitions for the First Step Act, a "prison job" qualifies an Inmate for Earned

Time Credits as a "productive activity" under the Act. See § 3635(3)(C)(xi). Therefore. Petitioner

as a Nonviolent Elderly Offender, was entitled to have one-third taken off his sentence and because

he had a "prison job" in the Power House at Devens and as an Orderly at MDC in charge of the

Library and the Chapel, Petitioner is clearly entitled to 15 days off for 26 months. Petitioner also

taught a very popular class at MDC on "How to Start a Business" for Earned Time Credits.

Therefore, Petitioner respectfully suggests that under the First Step Act as well as the CARES Act and credits that should be granted under *U.S. v. Macfarlane*. Petitioner is entitled to immediate release from Federal custody from the issuance of a Writ of Habeas Corpus pursuant to 28 USC 2241 and 28 USC 2243.

### III.      JUDGE GORTON'S CALCULATION IN MACFARLANE

In *United States v. Macfarlane*, 438 F.Supp.3d 125 (D.Mass. Apr. 14, 2020), Judge Gorton recognized the traditional standard that if a prisoner who was assigned to a Camp but experienced a lockdown, or ended up at a Maximum Security Facility like MDC Brooklyn then each week served in the lockdown in the Maximum Security Facility, was equal to a month off the inmate's sentence.

Petitioner was locked down at MDC Brooklyn from November 2019 until his release to Home Confinement in June 2020, so under the District Court's decision in *Macfarlane*, he should also have at least an additional 30 months taken off of his Supervised Release based on the ratio of one week in lockdown being equal to one month off an inmate's sentence when he should have been at a Camp. *See Macfarlane* at 127 ("...**the Court determines that Macfarlane's two-week confinement in solitary quarantine in a higher security facility *is the equivalent* of two months in the Camp to which he was originally assigned.**").

As the Second Circuit stated in *United States v. Ray*, 578 F.3d 184 (2d Cir. 2009): "[T]he Due Process Clause always protects defendants against fundamentally unfair treatment by the government in criminal proceedings." Id. at 199, *citing Doggett v. United States*, 505 U.S. 647, 666 (1992). In trying to craft a remedy for the Due Process violation in Ray, the Second Circuit eliminated the need for Ms. Ray to serve any of her custodial sentence or serve her time in a Halfway House and stated the following:

9

"The appropriate remedy for a proven due process violation often depends on the stage at which the violation is found and the relief sought." After a due process violation has occurred, courts endeavor to fashion relief that counteracts the prejudice caused by the violation. The Sixth Circuit has stated that 'suspension of the remainder of the sentence' is the appropriate remedy for a due process violation arising from a delayed resentencing. The violation of Ray's due process right has prejudiced her insofar as a delayed custodial sentence threatens to undermine her successful rehabilitation. To remedy that harm, the appropriate relief is to release her from any requirement that she submit to a custodial sentence. Accordingly, we conclude that the appropriate remedy in this case is the vacatur of Ray's sentence insofar as it imposes a six-month term of residence in a halfway house. *See Ray* at 202-03.

Therefore, it is clear that once a Due Process violation is discovered, it is up to the District Court to deliver the remedy, which is why the Court in *Ray* cancelled the rest of her sentence. Petitioner respectfully asks this Court to do the same because of the Due Process violations in this case.

But Petitioner was meant to be at a Camp at FMC Devens, not Maximum Security at MDC Brooklyn. Without warning, Petitioner was scooped up at Devens and shipped to MDC Brooklyn over Thanksgiving in November 2020. His family did not hear from him for four days. Based on Judge Gorton's now famous formula in *United States v. Macfarlane*, 438 F.Supp.3d 125 (D.Mass. Apr. 14, 2020), each week spent in a Higher Maximum-Security facility equals a month off of the Inmate's sentence. Just counting the weeks from December 1, 2019 to May 31, 2020 means that Petitioner is entitled to at least 28 months off of his "sentence" for Supervised Release. The purpose of reviewing the Standards under 18 U.S.C 3553 is to make sure that there are no sentencing disparities between the Circuits. People who actually pleaded guilty to fraud in Boston in the "Varsity Blues" case received ridiculously low sentences when compared to Petitioner—who is still trying to vacate his convictions in Boston as well as Connecticut. Similarly, the Government protested Petitioner's release under the CARES Act despite the fact that Petitioner had served over 25% of his sentence and was under 18 months to the door.

## IV.     EARNED TIME CREDITS UNDER THE FIRST STEP ACT

The First Step Act ("FSA"), which was enacted in December 2018, provided that all prisoners would receive 10 days, and those in a Camp or lower security facility with less of a chance of recidivism would receive an additional 5 days for a total of 15 days per month to be taken off their sentence or the period of Supervised Release. That means that because of Petitioner's status of being a White-Collar-Elderly-Offender assigned to a Camp and having the lowest PATTERN Score at MDC Brooklyn, he should be entitled to 15 days a month from March 2, 2019 to May 8, 2021 for a total of 13 Months off of his period of Supervised Release. Once again, the BOP has established that there is no difference between being at a Camp, a Halfway House, or on Home Confinement, so Petitioner is undoubtedly entitled at least 13 months of Earned Time Credits. *See, e.g.*, PS5321.08, written by BOP Director Kathleen Hawk Sawyer over 20 years ago: "A CCC [Halfway House] meets the definition of a penal or correctional facility pursuant to 18 U.S.C. §3621(b)." Perhaps the best description that Home Confinement is still "imprisonment" under the BOP's custody is Judge Ponsor's decision in *Iacoboni v. United States*, 251 F.Supp.2d 1015 (D. Mass. 2003):

> Indeed, the notion of "imprisonment" clearly encompasses conditions of confinement substantially less restrictive than community confinement. For example, §3624(c) authorizes the BOP to "assure that a prisoner serving a *term of imprisonment*" is given the opportunity to serve as much as six months of the final portion *"of the term"* in home confinement. *Id.* (emphasis supplied). In other words, Congress has recognized that an offender may serve a portion of a "term of imprisonment" while living at home, full time. As the Supreme Court recognized in *Koray*, the critical litmus is whether offenders "always remain subject to the control of the Bureau." *Reno v. Koray*, 515 U.S. 50, 63 (1995). Offenders imprisoned in community confinement are subject to BOP control. They are, as Chief Justice Rehnquist noted, "subject to BOP's disciplinary procedures; they are subject to summary reassignment to any other penal or correctional facility within the system, and, being in the legal custody of BOP, the Bureau has full discretion to control many conditions of their confinement." *Id.* BOP control is the touchstone of "imprisonment," and the BOP exercises complete control over all offenders placed in community corrections. They are imprisoned. Finally, the argument that the BOP, in exercising its Congressionally-bestowed discretion to designate as the "place of the prisoner's imprisonment...any available penal or correctional facility," §3621(b), is, in effect, failing to "imprison" the offender when it designates him or her to a community corrections facility simply ignores §3551, which can

only be read to include community confinement as a form of imprisonment, the last category of the three "authorized sentences." Thus, as a matter of law, and a matter of common sense, the argument that community confinement is not a form of imprisonment will not wash. *Id.* at 1029.

Therefore, Petitioner should be qualified for an additional 15 months of Earned Time Credits to reduce his 36-month period of Supervised Release pursuant to the First Step Act.

## V.     SPECIAL CIRCUMSTANCE IN THIS CASE WARRANT GRANTING IMMEDIATE RELEASE

Aside from the various motions made to vacate his conviction, Petitioner is entitled to the same credits and treatment under the First Step Act and the CARES Act that other prisoners received. All released prisoners are entitled to ask for the termination of their period of Supervised Release after serving one year. Petitioner began his period of Supervised Release on May 8, 2021. Under the Final rules released in January 2022, Petitioner is entitled to 13 months off based on 15 days per month. Petitioner always had a job in prison and was always receiving psychiatric care and was supervised by Government psychiatrists during his period in the Halfway House.

Petitioner respectfully refers the Court to the *Benatta* case, *United States v. Benatta*, 2003 WL 22202371 (W.D.N.Y. 2003), where a suspected 9-11 Terrorist had his indictment dismissed because he only spent four months at MDC Brooklyn instead of Petitioner's six months. Petitioner had to suffer through his 2016 trial at Wyatt because the Government never sent the Speedy Trial Notice required pursuant to 18 U.S.C 3161(j) to anyone at Canaan as required by law.

The district court's holding in *United States v. Benatta*, 2003 WL 22202371 (W.D.N.Y. 2003) is instructive. Petitioner was at MDC Brooklyn and Wyatt for a longer period of time than Benatta's 134 days. In *Benatta*, the court found a Speedy Trial delay and dismissed Benatta's indictment with prejudice. Clearly if Benatta, who was a suspected 9/11 terrorist arrested at the Canadian border, was granted a Due Process dismissal of the indictment certainly Petitioner is entitled to that same relief. However, for the purposes of this motion, Petitioner has an even better

§3161 argument than Benatta did, and while dismissal of an indictment for the Government's violation of §3161(j) may be rare, it did happen in *Benatta* and should happen in this case.

Petitioner should have been credited for his entire time at Wyatt prior to and during his trial, as he spent more time in detention in both Brooklyn and Wyatt than the defendant in *Benatta*, who again, had his indictment dismissed for the Due Process violations that were not as great as the violations in this case. The Due Process Delay bullet that the Government cannot possibly dodge is 18 U.S.C. §3161(j)(1), (2), and (3), which provide as follows:

> (j)(1) If the attorney for the government knows that a person charged with an offense is serving a term of imprisonment in any penal institution, he shall promptly –

> (B) cause a detainer to be filed with the person having custody of the prisoner and request him to so advise the prisoner and to advise the prisoner of his right to demand trial.

> 2. If the person having custody of such prisoner receives a detainer, he shall promptly advise the prisoner of the charge and of the prisoner's right to demand trial. If at any time thereafter the prisoner informs the person having custody that he does demand trial, such person shall cause notice to that effect to be sent promptly to the attorney for the government who caused the detainer to be filed.

> 3. Upon receipt of such notice, the attorney for the government shall promptly seek to obtain the presence of the prisoner for trial. *See Benatta* at *12-13.

In this case, the Government filed a Superseding Indictment with a whole new series of Money Laundering charges against Petitioner in May 2014, just one month before he would be reporting to prison. So, while the Government knew they were re-indicting Petitioner just before he reported to USP Canaan in June 2014, they did absolutely nothing as required under §3161(j). Then, without notifying Petitioner or his attorneys, they had Petitioner yanked out of his bunk after lights-out on December 28, 2015 and transferred to MDC Brooklyn that resulted in him being held in maximum security at both MDC Brooklyn for 60 days and at Wyatt for over 180 days, which is double the amount of time Benatta spent in maximum security. If a suspected 9/11 terrorist caught at the Canadian Border and held in Brooklyn MDC for only four months was released on Speedy

Trial grounds and had his indictment dismissed with prejudice pursuant to §3161(j), then Petitioner is well within his rights to respectfully request this Court order that same relief. In this case, the §3161(j) violation is two times greater than *Benatta*, and Petitioner is owed 12-months of time-served credits pursuant to §3585(b).

Petitioner deserves the same Due Process considerations as the defendants in *Ray* and *Benatta*, and asks only for the Court to recognize the Due Process violations in this case and apply the Earned Time Credits that Petitioner deserves to reduce his term of Supervised Release.

## IV.   PETITIONER IS ENTITLED TO RELIEF

Petitioner is an innocent man that was the victim of egregious prosecutorial misconduct detailed in two different Petitions before this Court. However, even assuming that Petitioner was as guilty as the famous Mobster Ronald Filocomo or Fraudster Roy William Harris, both of whom had their periods of Supervised Release terminated by the Court, the goals of Supervised Release have been reached. Petitioner has successfully reentered Society and there is no need for the Probation Office to waste valuable time and money to supervise Petitioner. Clearly it is in the interests of justice to terminate Petitioner's period of Supervised Release because Petitioner meets all of the relevant criteria from § 3553(a) and the nine policy criteria outlined in *Filocomo*. See *Filocomo* Criteria in Exhibit Four. There is no good reason to keep "supervising" an innocent man purportedly in the interests of justice. Instead, Petitioner respectfully asks the Court to review what Petitioner did with his time in prison and under Supervised Release from June 2014 to May 2021. Petitioner wrote several books including writing, compiling, and editing The Prison of Hope Bible. that is available on Amazon (see: https://www.amazon.com/Prisoner-Hope-Bible-Foundation/dp/1723014540/ref=sr_1_3?crid=NU6FJAS4EZA3&keywords=The+Prison+of+Hope+Bible&qid=1665500104&qu=eyJxc2MiOiIwLjcwIiwicXNhIjoiMC4wMCIsInFzcCI6IjAuMD

AifQ%3D%3D&sprefix=the+prison+of+hope+bible%2Caps%2C84&sr=8-3—and he helped over 180 inmates with their legal work resulting in 120 of them getting out of prison early under the FSA and the CARES Act. He also taught courses at MDC Brooklyn including the very popular "How to Start Your Own Business"—which virtually every person in the Cadre at MDC Brooklyn signed up for. This Court would certainly be acting in the interests of justice if it granted this Petition, terminated Petitioner's remaining period of Supervised Release, and then ordered Petitioner's immediate release from Federal custody.

## CONCLUSION

Petitioner deserves the same Due Process considerations as the defendants in *Ray* and *Benatta*, and asks only for the Court to recognize the egregious Due Process violations in this case and apply the Earned Time Credits of the First Step Act and Judge Gorton's calculation of time credits under *Macfarlane* and order Petitioner's immediate release from Federal custody pursuant to 28 USC 2243 as was done for Lieutenant Merryman during the Civil War.

Respectfully submitted,

/s/ Daniel E. Carpenter
Daniel E. Carpenter
Petitioner, *pro se*
18 Pond Side Lane
West Simsbury, CT
06092

15

# EXHIBIT ONE

March 11, 2020 Order to Show Cause by Judge Kuntz





UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

DANIEL E. CARPENTER

                Petitioner,

      v.

KATHLEEN HAWK SAWYER

                Respondent.
-----------------------------------------------------------x

**ORDER TO SHOW CAUSE**

**WILLIAM F. KUNTZ, II, United States District Judge:**

        Upon the petition for issuance of a writ of habeas corpus pursuant to 28 U.S.C. 2241, dated February 11, 2020, it is **ORDERED**:

    (1)    The United States Attorney, as attorney for Respondent, show cause before this Court why a writ of habeas corpus should not be issued by the filing of a return to the petition within sixty (60) days of receipt of this Order;

    (2)    Respondent shall serve a copy of the return on Petitioner herein and shall file the original thereof, with proof of such service, with Clerk of this Court;

    (3)    Service of a copy of this Order and petition shall be made electronically by the Clerk upon the United States Attorney, and by mailing a copy of this Order to the petitioner;

    (4)    Petitioner, within thirty (30) days of receipt of a copy of the return, shall file a reply, if any, with the Clerk of the Court and serve a copy on Respondent;

    (5)    All communications with the Court must be served on the opposing party.

                  SO ORDERED.

                  s/WFK

                  WILLIAM F. KUNTZ, II
                  **United States District Judge**
                  **Eastern District of New York**

Dated: March 10, 2020
       Brooklyn, New York

# EXHIBIT TWO

Government's Motion to Judge Kuntz to transfer Petitioner's
2241 to Connecticut



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

PTH:GN                          *271 Cadman Plaza East*
F. #2020V00762                  *Brooklyn, New York 11201*

May 13, 2020

<u>By E-Mail and ECF</u>

The Honorable William F. Kuntz, II
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

    Re: Daniel E. Carpenter v.  Kathleen Hawk Sawyer
       <u>Civil Docket No. 20-810 (WFK) (LB)</u>

Dear Judge Kuntz:

    The government respectfully submits this letter in response to the defendant Daniel Carpenter's motion requesting that he be immediately released to home confinement pursuant to the First Step Act ("Act").  (<u>See</u> ECF No. 1 ("Def.'s Mem").).  For the reasons set forth below, the government respectfully requests that the Court transfer the defendant's motion to the United States District Court, District of Connecticut, to be filed in his underlying criminal case docket, <u>United States v. Carpenter</u>, 3:13-CR-00226 (RNC). Although the defendant's motion is docketed here as a petition for habeas relief, his motion is in fact a request for compassionate relief and should be decided by the original sentencing court in the District of Connecticut.

I. <u>Background</u>

    A. <u>Prior Compassionate Release Motions Filed by the Defendant in the</u>
      <u>District of Connecticut</u>

    By way of background, on or about December 12, 2013, a grand jury in Hartford, Connecticut returned a 33-count indictment charging the defendant with mail fraud, wire fraud, and conspiracy to commit mail and wire fraud for operating a scheme to defraud life insurance providers.  (<u>See</u> <u>Carpenter</u>, ECF No. 510, at 2 (Govt.'s Mem. in Opp'n

to Def.'s Mots. for Sentence Reduction or Home Confinement.)[1]  On or about May 14, 2014, the grand jury in Connecticut returned a 57-count superseding indictment adding charges of money laundering conspiracy, illegal monetary transactions and money laundering, related to the defendant spending over $30 million in fraudulent scheme proceeds.  (Id.)  The Honorable Robert N. Chatigny conducted a bench trial in the matter, and on June 6, 2016, issued a Verdict and Special Findings, finding the defendant guilty on all counts.  (Id. at 3.)  On or about December 3, 2018, Judge Chatigny sentenced the defendant to 30 months' imprisonment and entered the judgment on December 20, 2018.  (See Carpenter, ECF Nos. 400, 411.)  Judge Chatigny also denied the defendant's motion for reconsideration of the judgment, in which the defendant argued inter alia, that he was entitled to time served or home confinement.  (See Carpenter, ECF Nos. 416, 417.)  The defendant began serving his 30-month sentence on or about March 22, 2019.  (See Carpenter, ECF No. 510, at 5.)

On January 27, 2020 and March 13, 2020, the defendant filed two pro se emergency motions in the District of Connecticut arguing that he was entitled to an immediate reduction of his sentence to time served and immediate release to home confinement pursuant to 18 U.S.C. § Section 3582(c) and the First Step Act.  (See Carpenter, ECF Nos. 506, 507.)  The United States Attorney's Office in the District of Connecticut opposed the motions (see Carpenter, ECF No. 510), and the parties engaged in supplemental briefing on the matter between March 26, 2020 and April 2, 2020.  (See Carpenter, ECF Nos. 511-516.)[2]  On or about April 2, 2020, Judge Chatigny conducted a telephonic motion hearing and denied the defendant's motions for relief without prejudice to renew, primarily for the reasons stated in the government's March 19, 2020 opposition brief.  (See Carpenter, ECF Nos. 517 (Dkt. Entry Order), 520 (Govt.'s Mem. in Opp'n to Def.'s Mot. to Reconsider (recounting the court's telephonic rulings).)

Shortly thereafter, on or about April 7, 2020, the defendant filed a motion asking the court to reconsider its denial of his prior motion for compassionate release and provided the court with his medical records.  (See ECF No. 518.)  After full briefing on the motion, on April 10, 2020, Judge Chatigny denied the defendant's motion for reconsideration, citing the defendant's failure to satisfy the statutory exhaustion requirement in 18 U.S.C. § Section 3582(c)(1)(A)(i) and the defendant's failure to provide an

---

[1] All Carpenter citations refer to public filings on the defendant's criminal case docket, United States v. Carpenter, 3:13-CR-00226 (RNC), in the United States District Court, District of Connecticut.

[2] The defendant has also previously filed a motion with the Second Circuit requesting bail pending appeal due to COVID-19 concerns.  On March 25, 2020, prior to the filing of the defendant's supplemental briefing to the district court, the Second Circuit denied the defendant's request without prejudice.  See United States v. Carpenter, No. 19-70 (2d Cir. March 25, 2020), ECF No. 136.  Nonetheless, the defendant, through counsel, continued to request compassionate release relief based on COVID-19 and conditions at MDC Brooklyn in his supplemental briefings.

individualized  assessment of his medical condition with regard to the risk posed by COVID-19.  (See Carpenter, ECF No. 525 (Dkt. Entry Order).)

B.  The Defendant's Instant Compassionate Release Motion

On or about February 11, 2020, while the defendant's compassionate release motions were still pending in the District of Connecticut, the defendant filed a pro se motion with this Court, captioned "Motion for Immediate Release to Home Confinement, Declaratory Judgment, and Injunctive Relief Pursuant to the First Step Act."  (ECF No. 1.) Although the defendant's motion was docketed here as a Section 2241 habeas petition, the defendant's motion is substantially the same as the Section 3582(c) compassionate release motions he filed in the District of Connecticut in his criminal case on January 27, 2020 and March 13, 2020.  Indeed, the defendant's brief does not refer to any of the habeas statutes and raises the same First Step Act argument—that he is entitled to immediate home confinement under the First Step Act's Elderly Offender Program—that was ultimately rejected by Judge Chatigny on April 2, 2020 after a full hearing on the merits.  (Compare ECF No. 1 (instant motion) with Carpenter, ECF Nos. 506, 507 (defendant's pro se compassionate release motions).)

II.   Discussion

The government respectfully submits that the Court treat the instant motion as a compassionate release motion under the First Step Act and transfer the motion to the original sentencing court for adjudication.  As noted above, the defendant's instant motion was filed contemporaneously as the First Step Act motions he filed in the District of Connecticut requesting relief under 18 U.S.C. § Section 3582(c) and the arguments and requested relief raised in both set of motions are identical in substance.  Moreover, by its plain language, 18 U.S.C. § 3582(c)(1)(A) requires the defendant to move for a reduction in his sentence in the original sentencing court.  Thody v. Swain, No. CV 19-09641-PA (DFM), 2019 WL 7842560, at *2 (C.D. Cal. Nov. 26, 2019), report and recommendation adopted, No. CV 19-09641-PA (DFM), 2020 WL 564813 (C.D. Cal. Feb. 5, 2020); see also Bolden v. Ponce, No. 220CV03870JFWMAA, 2020 WL 2097751, at *2 (C.D. Cal. May 1, 2020) (stating "[o]nly the original sentencing court can entertain [Section 3582] requests" and collecting cases stating the same); see also United States v. Arrango, 291 F.3d 170, 171-72 (2d Cir. 2002) (holding that a motion under 18 U.S.C. § 3582(c)(2) is "a continuation of the prior criminal proceeding").  As such, given that the defendant was prosecuted, convicted and sentenced in the District of Connecticut, any motion for compassionate release should be made and decided by the original sentencing judge in that forum.  Finally, transfer of the compassionate release motion is appropriate here, where the original sentencing court has already ruled on the issues raised in the defendant's instant motion and is familiar with the underlying criminal case, the sentencing, and the defendant's numerous post-conviction challenges to his sentence.[3]

_____

[3] To the extent that the Court disagrees with the government's position that the defendant's instant motion is a successive compassionate release motion that belongs to the

III.   Conclusion

        For the foregoing reasons, the government respectfully requests that the defendant's motion for relief under the First Step Act be transferred to the United States District Court for the District of Connecticut.

                            Respectfully submitted,

                            RICHARD P. DONOGHUE
                            United States Attorney

By:       /s/Genny Ngai
                            Genny Ngai
                            Assistant U.S. Attorney
                            (718) 254-6393

cc: Daniel E. Carpenter (by U.S. mail)

---

jurisdiction of the original sentencing court, the government respectfully requests that the Court administer the defendant Adams warnings and allow him the opportunity to withdraw his motion prior to converting the defendant's motion into a habeas petition. Because the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") prohibits second or successive applications for habeas relief without leave of the Second Circuit, the Second Circuit has cautioned district courts from sua sponte converting post-conviction motions like Section 3582 motions into habeas petitions "without first giving the petitioner notice and an opportunity to decline the conversion or withdraw the motion." Simon v. United States, 359 F.3d 139, 140 (2d Cir. 2004); see, e.g., United States v. Lopez, No. 12-CR-358 (KAM), 2020 WL 2063420, at *4 (E.D.N.Y. Apr. 29, 2020) (administering the Adams warning to the defendant where the defendant styled his motion as a "motion for *nunc pro tunc*" and sought credit for time served before deciding on the merits of the motion); United States v. Boghosian, No. 05 CR. 351-01 (LAP), 2010 WL 11651994, at *2 (S.D.N.Y. May 13, 2010) (same). If the defendant elects to proceed under Section 2241, the government respectfully requests additional time to respond to the merits of the defendant's motion.

# EXHIBIT THREE

Petitioner's Motion to Reduce Period of Supervised Release
filed March 1, 2021



# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DANIEL E. CARPENTER | ) | CRIMINAL NO. 3:13-CR-226(RNC) |
| | ) | |
| v. | ) | February 24, 2021 |
| | ) | |
| FEDERAL BUREAU OF PRISONS | ) | |

## MOTION TO REDUCE PERIOD OF SUPERVISED RELEASE BASED ON THE FIRST STEP ACT, 18 U.S.C. §3582(c)(1)(B) AND 28 U.S.C. §2243

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

MAR 1 2021 PM 12:40
FILED-USDC-CT-HARTFORD

| | | |
|---|---|---|
| DANIEL E. CARPENTER | ) | |
| | ) | CRIMINAL NO. 3:13-CR-226(RNC) |
| v. | ) | |
| | ) | February 24, 2021 |
| FEDERAL BUREAU OF PRISONS | ) | |
| | ) | |

**MOTION TO REDUCE PERIOD OF SUPERVISED RELEASE BASED ON
THE FIRST STEP ACT, 18 U.S.C. §3582(c)(1)(B) AND 28 U.S.C. §2243**

NOW COMES THE PETITIONER, Daniel E. Carpenter, *pro se*, to ask this Honorable

Court to reduce the period of his Supervised Release based on credits provided under the First Step

Act, 18 U.S.C. §3582(c)(1)(B), and this Court's inherent power under 28 U.S.C. §2243 to reduce

a sentence of Supervised Release based on challenges to the Bureau of Prisons and its calculation

of his sentence.

Respectfully submitted,

/s/ Daniel E. Carpenter
Daniel E. Carpenter
Petitioner, *pro se*
18 Pond Side Lane
West Simsbury, CT 06092

**NO ORAL ARGUMENT REQUESTED**

MAR 1 2021 PM 12:40
FILED-USDC-CT-HARTFORD

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

DANIEL E. CARPENTER     )
                                   )       CRIMINAL NO. 3:13-CR-226(RNC)
v.                           )
                                   )       February 24, 2021
FEDERAL BUREAU OF PRISONS   )

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO REDUCE PERIOD OF SUPERVISED RELEASE BASED ON THE FIRST STEP ACT, 18 U.S.C. §3582(c)(1)(B) AND 28 U.S.C. §2243

NOW COMES THE PETITIONER, Daniel E. Carpenter, *pro se*, to ask this Honorable Court to reduce the period of his Supervised Release based on credits provided under the First Step Act, 18 U.S.C. §3582(c)(1)(B), and this Court's inherent power under 28 U.S.C. §2243 to reduce a sentence of Supervised Release based on challenges to the Bureau of Prisons and its calculation of his sentence.

## NO ORAL ARGUMENT REQUESTED

1

## PRELIMINARY STATEMENT

As this Court is well aware, Petitioner has exhausted his administrative remedies pursuant to the First Step Act not once, but several times, and has already filed various petitions with courts in Massachusetts and Brooklyn pursuant to 28 U.S.C. §2241. As the Court is also aware, it is black-letter law in the Second Circuit that Petitioner can challenge the exercise of his sentence and ask to reduce a period of Supervised Release when the BOP has been negligent in crediting time under the law for the serving of Petitioner's sentence. *See Levine v. Apker*, 455 F.3d 71 (2d Cir. 2006): "There is no question, moreover, that 28 U.S.C. §2243 authorizes the district court to provide habeas relief as law and justice require, including a reduction in a petitioner's term of supervised release." *Id.* at 77.

## I.      LEGAL STANDARD

Enacted on December 21, 2018, the First Step Act (hereinafter "FSA") was the result of a bipartisan legislative effort to overhaul the criminal justice system and provide Earned Time Credits for the reduction in sentences for nonviolent elderly offenders as well as other drug-based crimes that receive extraordinarily long sentences. Congress aimed to enhance public safety by improving the effectiveness and efficiency of the federal prison system with a new Risk and Needs Assessment Program known as PATTERN, and everyone would receive a PATTERN Score so that they could be assessed for whether they receive 10 or 15 days a month off for those determined to be low risk, nonviolent offenders. *See* 18 U.S.C. §3632(d)(4)(A):

> The Act also makes clear that "[T]ime credits earned under this paragraph by prisoners that actively participate in recidivism or activities shall be applied to time in prerelease custody or **supervised release**. The Director of the Bureau of Prisons shall transfer eligible prisoners as determined under §3624(g) into prelease custody or supervised release." *Id.* Furthermore, under the federal sentencing statutes: "[I]f the Sentencing Court included as part of the prisoner's sentence a requirement that the prisoner be placed on a term of Supervised Release after imprisonment…the Director of the Bureau of Prisons may

2

transfer the prisoner to begin any such term of supervised release at an earlier date…based on the application of earned time credits under §3532." *See* §3521(g)(3).

Petitioner's sentence included three (3) years of Supervised Release, and therefore under application of the FSA, the Earned Time Credits Petitioner earned should be used to reduce his period of Supervised Release. Additionally, §3632(d)(6) provides: "In addition, the incentives described in this Subsection shall be in addition to any other rewards or incentives for which a prisoner may be eligible." Petitioner was entitled to 135 days of Good Conduct Time credits, and was also entitled to have three months of Home Confinement pursuant to §3624(c), which he obviously never received. This Court can remedy that by ordering Petitioner's immediate release pursuant to §3582(c)(1)(B) based on a change in the statutes or the Court's inherent authority to issue Writs pursuant to 28 U.S.C. §2243. *See, e.g., Levine v. Apker*, 455 F.3d 71 (2d Cir. 2006), stating that the District Court has the right pursuant to §2243 to reduce a prisoner's term of Supervised Release.

In fact, this Court determined that it also had the right pursuant to the FSA to reduce a defendant's period of Supervised Release in *United States v. Page*, 2020 WL 1698671 at *6-7 (D.Conn. April 8, 2020).

> Returning to the First Step Act, I conclude that it authorizes a reduction in a term of supervised release. The First Step Act constitutes an authorization to "impose a reduced sentence." A sentence is comprised of at least two parts: the term of imprisonment and the term of supervised release. *See* 18 U.S.C. §3583(a) ("The court, in imposing a sentence to a term of imprisonment…may include as a part of the sentence a requirement that the defendant be placed on a term of supervised release after imprisonment…"). The First Step Act therefore authorizes courts to reduce both a term of imprisonment and a term of supervised release…This construction comports with the statutory text and the remedial purposes of the First Step Act and the Fair Sentencing Acts. *See Page* at 7, *citing United States v. Simons*, 375 F.Supp.3d 379, 382 (E.D.N.Y. 2019).

3

Therefore, Petitioner respectfully suggests that under the First Step Act as well as the credits granted for the Due Process violations in this case, Petitioner is entitled to have his 36 months of Supervised Release reduced to zero by this Honorable Court.

## II.    JUDGE GORTON'S CALCULATION IN *MACFARLANE*

In *United States v. Macfarlane*, 438 F.Supp.3d 125 (D.Mass. Apr. 14, 2020), Judge Gorton recognized the traditional standard that if a prisoner who was assigned to a Camp ended up being sent to a higher security prison or experienced a lockdown, then each week served in the maximum security facility was equal to a month in the camp facility. In this case, without warning, notice, or any reason, the BOP transferred Petitioner from the relatively nice environments of the Camp at FMC Devens, through Wyatt, and then to Maximum Security facility at MDC Brooklyn from Thanksgiving until his release in 2020. At this late date Petitioner still has never been told why.

Moreover, Petitioner was locked down at MDC Brooklyn from March 31, 2020 until his release on June 3, 2020, so under the District Court's decision in *Macfarlane*, he should also have an additional many months taken off of his Supervised Release based on the ratio of one week at MDC Brooklyn being equal to one month off an inmate's sentence when he should have been at a Camp. *See Macfarlane* at 127 ("...the Court determines that Macfarlane's two-week confinement in solitary quarantine in a higher security facility *is the equivalent* of two months in the Camp to which he was originally assigned."). In fact, Paul Irby, General Counsel of the BOP's office of the Designation and Sentence Calculation Center (DSCC) in Grand Prairie, Texas told Petitioner's prison consultant that Petitioner would need to sue the BOP to find out the reasons for this transfer of a nonviolent Elderly Offender from the Camp at Devens to a Maximum Security facility at MDC Brooklyn.

Now that Petitioner has served almost his entire sentence (his Supervised Release begins May 8, 2021), there is no reason to question the rationale for why the BOP took an elderly White-Collar inmate out of the Camp at Devens to put him in MDC Brooklyn where he was surrounded by known killers and members of MS-13. There can be no excuse for why the BOP did this. But, now that Petitioner is on Community Confinement through Watkinson House and is almost at the end of his sentence, and based on the time that Petitioner spent at MDC Brooklyn from November 2019 to June 2020 (a total of 30 weeks), Petitioner is entitled to have 30 months taken off of his period of Supervised Release. Additionally, because Petitioner was locked down 24/7 from March 31, 2020 to June 3, 2020 due to the COVID-19 Pandemic, which should give him another 10 months of credit for the 10 weeks of being locked down in a small cell in a Maximum Security facility with no time to exercise and with limited access for basic activities as taking a shower.

As the Second Circuit stated in *United States v. Ray*, 578 F.3d 184 (2d Cir. 2009): "[T]he Due Process Clause always protects defendants against fundamentally unfair treatment by the government in criminal proceedings." *Id.* at 199, *citing Doggett v. United States,* 505 U.S. 647, 666 (1992). In trying to craft a remedy for the Due Process violation in *Ray*, the Second Circuit eliminated the need for Ms. Ray to serve any of her custodial sentence or serve her time in a Halfway House and stated the following:

> "The appropriate remedy for a proven due process violation often depends on the stage at which the violation is found and the relief sought." After a due process violation has occurred, courts endeavor to fashion relief that counteracts the prejudice caused by the violation. The Sixth Circuit has stated that 'suspension of the remainder of the sentence' is the appropriate remedy for a due process violation arising from a delayed resentencing. The violation of Ray's due process right has prejudiced her insofar as a delayed custodial sentence threatens to undermine her successful rehabilitation. To remedy that harm, the appropriate relief is to release her from any requirement that she submit to a custodial sentence. Accordingly, we conclude that the appropriate remedy in this case is the vacatur of Ray's sentence insofar as it imposes a six-month term of residence in a halfway house. *See Ray* at 202–03.

5

Therefore, it is clear that once a Due Process violation is discovered, it is up to the district court to deliver the remedy, which is why the court in *Ray* cancelled the rest of her sentence. Petitioner respectfully asks this Court to do the same.

## III.   EARNED TIME CREDITS UNDER THE FIRST STEP ACT

The First Step Act ("FSA"), which was enacted in December 2018, provided that all prisoners would receive 10 days, and those in a Camp or lower security facility with less of a chance of recidivism would receive an additional 5 days for a total of 15 days per month to be taken off their sentence or the period of Supervised Release. That means that because of Petitioner's status of being an elderly White-Collar prisoner assigned to a Camp and having the lowest PATTERN Score at MDC Brooklyn, he should be entitled to 15 days a month from March 2, 2019 to May 8, 2021 for a total of 13 Months off of his period of Supervised Release. Once again, the BOP has established that there is no difference between being at a Camp, a Halfway House, or on Home Confinement, so Petitioner is undoubtedly entitled at least 13 months of Earned Time Credits. *See, e.g.,* PS5321.08, written by BOP Director Kathleen Hawk Sawyer over 20 years ago: "A CCC [Halfway House] meets the definition of a penal or correctional facility pursuant to 18 U.S.C. §3621(b)." Perhaps the best description that Home Confinement is still "imprisonment" under the BOP's custody is Judge Ponsor's decision in *Iacoboni v. United States*, 251 F.Supp.2d 1015 (D. Mass. 2003):

> Indeed, the notion of "imprisonment" clearly encompasses conditions of confinement substantially less restrictive than community confinement. For example, §3624(c) authorizes the BOP to "assure that a prisoner serving a *term of imprisonment*" is given the opportunity to serve as much as six months of the final portion "*of the term*" in home confinement. *Id.* (emphasis supplied). In other words, Congress has recognized that an offender may serve a portion of a "term of imprisonment" while living at home, full time. As the Supreme Court recognized in *Koray*, the critical litmus is whether offenders "always remain subject to the control of the Bureau." *Reno v. Koray*, 515 U.S. 50, 63 (1995). Offenders imprisoned in community confinement are subject to BOP control. They are, as Chief Justice Rehnquist noted, "subject to BOP's disciplinary procedures; they are subject

to summary reassignment to any other penal or correctional facility within the system, and, being in the legal custody of BOP, the Bureau has full discretion to control many conditions of their confinement." *Id.* BOP control is the touchstone of "imprisonment," and the BOP exercises complete control over all offenders placed in community corrections. They are imprisoned. Finally, the argument that the BOP, in exercising its Congressionally-bestowed discretion to designate as the "place of the prisoner's imprisonment...any available penal or correctional facility," §3621(b), is, in effect, *failing* to "imprison" the offender when it designates him or her to a community corrections facility simply ignores §3551, which can only be read to include community confinement as a form of imprisonment, the last category of the three "authorized sentences." Thus, as a matter of law, and a matter of common sense, the argument that community confinement is not a form of imprisonment will not wash. *Id.* at 1029.

During his period of incarceration and while assigned to the BOP Halfway House, Watkinson House, for Home Confinement, not only did Petitioner display exemplary conduct, he also took numerous classes and even taught several classes. Petitioner also had a steady job at Devens in the Powerhouse and was an admin orderly in charge of the Chapel and Library at MDC Brooklyn. Therefore, Petitioner should be qualified for 13 months of Earned Time Credits to reduce his 36 month period of Supervised Release pursuant to the First Step Act.

IV.     **DUE PROCESS VIOLATION ANALYSIS UNDER** *BENATTA*

The District Court's holding in *United States v. Benatta*, 2003 WL 22202371 (W.D.N.Y. 2003) is instructive. In *Benatta*, the District Court found a Speedy Trial delay under 18 U.S.C. §3161(j) and dismissed Benatta's indictment with prejudice. Clearly if Benatta, who was a suspected 9/11 terrorist arrested at the Canadian border, was granted a Due Process dismissal of his indictment certainly Petitioner is entitled to that same relief. However, for the purposes of this Motion, Petitioner has an even better §3161(j) argument than Benatta did, and while dismissal of an indictment for the Government's violation of §3161(j) may be rare, it did happen in *Benatta* and should also happen in this case. If the District Court in *Benatta* had the right to dismiss Benatta's indictment for the 134 days he spent at MDC Brooklyn, certainly this Court has the right to resentence Petitioner to time served and no Supervised Release, if not dismissing Petitioner's

Indictment altogether as was done in *Benatta*. All told, Petitioner spent a longer time at Wyatt for his trial in 2016, and certainly spent more time at MDC Brooklyn from November to June than Benatta did, and the conditions that Petitioner suffered through were far worse than anything Benatta suffered and at no time was Petitioner suspected of being a Terrorist.

Significantly, Petitioner should have been credited for his entire time at Wyatt prior to and during his trial, as he spent more time in detention in both MDC Brooklyn and Wyatt than the defendant in *Benatta*, who again, had his indictment dismissed for the Due Process violations that were not as great as the violations in this case. However, the Due Process Delay bullet that the Government cannot possibly dodge is 18 U.S.C. §3161(j)(1), (2), and (3), which provide as follows:

> (j)(1) If the attorney for the government knows that a person charged with an offense is serving a term of imprisonment in any penal institution, he shall promptly –
>
> (B) cause a detainer to be filed with the person having custody of the prisoner and request him to so advise the prisoner and to advise the prisoner of his right to demand trial.
>
> 2. If the person having custody of such prisoner receives a detainer, he shall promptly advise the prisoner of the charge and of the prisoner's right to demand trial. If at any time thereafter the prisoner informs the person having custody that he does demand trial, such person shall cause notice to that effect to be sent promptly to the attorney for the government who caused the detainer to be filed.
>
> 3. Upon receipt of such notice, the attorney for the government shall promptly seek to obtain the presence of the prisoner for trial. *See Benatta* at *12-13.

In this case, the Government filed a Superseding Indictment with a whole new series of Money Laundering charges against Petitioner in May 2014, just one month before the Government knew that Petitioner would be reporting to prison in June 2014. So, while the Government knew they were re-indicting Petitioner just before he was to report USP Canaan in June 2014, they did absolutely nothing as required under §3161(j) to notify Petitioner or the Warden at Canaan. Then, without notifying Petitioner or his attorneys, they had Petitioner yanked out of his bunk after lights-

out on December 28, 2015 and transferred to MDC Brooklyn that resulted in him being held in maximum security at both MDC Brooklyn for 60 days and at Wyatt for over 180 days, which is double the amount of time Benatta spent in maximum security. If a suspected 9/11 terrorist caught at the Canadian Border and held in MDC Brooklyn for only four months was released on Speedy Trial grounds and had his indictment dismissed with prejudice pursuant to §3161(j), then Petitioner is well within his rights to respectfully request this Court order that same relief. All told, in this case, the §3161(j) violation is four times greater than *Benatta*, and Petitioner is owed 12 months of time-served credits pursuant to §3585(b) for the time period between January 27, 2016 to January 27, 2017. In addition to the Halfway House and Home Confinement time that is guaranteed to everyone pursuant to §3624(c), Petitioner has been deprived of that time no less than twice now, which should result in yet another credit against his 36 months of Supervised Release.

## CONCLUSION

Petitioner deserves the same Due Process considerations as the defendants in *Ray* and *Benatta*, and asks only for the Court to recognize the Due Process violations in this case and apply the Earned Time Credits of the First Step Act and Judge Gorton's calculation of time credits under *Macfarlane* to resentence Petitioner to time served and to eliminate his Supervised Release as was done by the Second Circuit in *Ray*.

Respectfully submitted,

/s/ Daniel E. Carpenter
Daniel E. Carpenter
Petitioner, *pro se*
18 Pond Side Lane
West Simsbury, CT 06092

**NO ORAL ARGUMENT REQUESTED**

9

# EXHIBIT FOUR

Petitioner's Petition for Immediate Termination of Supervised
Release filed May 25, 2022

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| DANIEL E. CARPENTER | ) | CRIMINAL NO.3:13-CR-226(RNC) |
| *Petitioner* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA | ) | MAY 25, 2022 |
| *Respondent* | ) | |
| | ) | |

MAY 25 2022 PM 1:45
FILED-USDC-CT-HARTFORD

**PETITION FOR IMMEDIATE TERMINATION OF SUPERVISED RELEASE**
**PURSUANT TO THE FIRST STEP ACT, 18 U.S.C. §3583(e)(1) AND 28 U.S.C. §2243**

**IMMEDIATE ORDER TO SHOW CAUSE REQUESTED**

1

### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| DANIEL E. CARPENTER<br>*Petitioner* | ) ) ) | CRIMINAL NO.3:13-CR-226(RNC) |
| v. | ) ) | |
| UNITED STATES OF AMERICA<br>*Respondent* | ) ) ) | MAY 25, 2022 |

MAY 25 2022 PM1:45
FILED-USDC-CT-HARTFORD

### PETITION FOR IMMEDIATE TERMINATION OF SUPERVISED RELEASE PURSUANT TO THE FIRST STEP ACT, 18 U.S.C. §3583(e)(1) AND 28 U.S.C. §2243

NOW COMES THE PETITIONER, Daniel E. Carpenter, *pro se*, to ask this Honorable

Court for the immediate termination of his Supervised Release pursuant to 18 U.S.C. §3583(e)(1)

and based on credits provided under the First Step Act, and this Court's inherent power under 28

U.S.C. §2243 to reduce a sentence of Supervised Release at any time based on the interests of

justice.

Respectfully submitted,

/s/ Daniel E. Carpenter
Daniel E. Carpenter
Petitioner, *pro se*
18 Pond Side Lane
West Simsbury, CT
06092

**IMMEDIATE ORDER TO SHOW CAUSE REQUESTED**

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| DANIEL E. CARPENTER | ) | CRIMINAL NO.3:13-CR-226(RNC) |
| *Petitioner* | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| UNITED STATES OF AMERICA | ) | MAY 25, 2022 |
| *Respondent* | ) |  |
|  | ) |  |

MAY 25 2022 PM 1:45
FILED-USDC-CT-HARTFORD

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PETITION FOR THE IMMEDIATE TERMINATION OF PETITIONER'S SUPERVISED RELEASE PURSUANT TO THE FIRST STEP ACT, 18 U.S.C. §3583(e)(1) AND THE COURT'S INHERENT POWER UNDER 28 U.S.C. §2243**

NOW COMES THE PETITIONER, Daniel E. Carpenter, *pro se*, to ask this Honorable Court to reduce the period of his Supervised Release pursuant to 18 U.S.C. §3583(e)(1) as provided for under the First Step Act, and this Court's inherent power under 28 U.S.C. §2243.

**IMMEDIATE ORDER TO SHOW CAUSE REQUESTED**

3

## PRELIMINARY STATEMENT

This Court has written the seminal decision on the necessary interaction between the First

Step Act and Section 18 USC 3583(e)(1) to achieve the interests of justice in *United States v.*

*Page,* 2020 WL 1698671 at \*6-7 (D.Conn. April 8, 2020), where this Court took two full years

off of the Defendant's period of Supervised Release in addition to commuting his sentence to time

served:

> Returning to the First Step Act, I conclude that it authorizes a reduction in a term of
> supervised release. The First Step Act constitutes an authorization to "impose a
> reduced sentence." A sentence is comprised of at least two parts: the term of
> imprisonment and the term of supervised release. *See* 18 U.S.C. §3583(a) ("The court,
> in imposing a sentence to a term of imprisonment...may include as a part of the
> sentence a requirement that the defendant be placed on a term of supervised release
> after imprisonment..."). The First Step Act therefore authorizes courts to reduce both
> a term of imprisonment and a term of supervised release...This construction comports
> with the statutory text and the remedial purposes of the First Step Act and the Fair
> Sentencing Acts. *See Page* at 7, *citing United States v. Simons,* 375 F.Supp.3d 379, 382
> (E.D.N.Y. 2019).

This Court is also well aware that Petitioner has served his full sentence and not received

***any*** benefits from the First Step Act because of the Government's persistence to make sure that

Supervised Release in Petitioner's case was "additional punishment" rather than the

Rehabilitation and gradual reentry into Society that it was meant to be. Therefore, it is black-letter

law in the Second Circuit that Petitioner can apply to this Court for the immediate termination of

his period of Supervised Release because the Bureau of Prisons and the Government have been

negligent in applying the various credits created under the First Step Act to reduce the prison

sentences for White-Collar criminals over the Age of 60. *See Levine v. Apker*, 455 F.3d 71 (2d Cir.

2006): "There is no question, moreover, that 28 U.S.C. §2243 authorizes the district court to

provide habeas relief as law and justice require, including a reduction in a petitioner's term of

supervised release." *Id.* at 77.

4

I.    **CRITERIA FOR ENDING SUPERVISED RELEASE**

The Judicial Conference on Criminal Law has elaborated on 18 U.S.C. § 3583(e)(1)'s

statutory criteria and recommended that probation officers evaluate nine factors when deciding

whether to approve early termination of Supervised Release.

Those factors are:

1)  Stable community reintegration (e.g., residence, family, employment);

2)  Progressive strides toward supervision objectives and in compliance with all conditions of supervision;

3)  No aggravated role in the offense of conviction, particularly large drug or fraud offenses;

4)  No history of violence;

5)  No recent arrests or convictions;

6)  No recent evidence of alcohol or drug abuse;

7)  No recent psychiatric episodes;

8)  No identifiable risk to the safety of any identifiable victim; and

9)  No identifiable risk to public safety based on the Risk Prediction Index.

*See United States v. Filocomo*, No. 02CR30731S16 (NGG), 2022 WL 118735, at *1

(E.D.N.Y. Jan. 12, 2022).

## II.   IMMEDIATE RELIEF REQUESTED

Petitioner assumes that the Government will file its standard defamatory objections. Therefore, this Court should either grant immediate relief and terminate the remaining period of Petitioner's Supervised Release or issue an Order to Show Cause why relief should not be granted. Currently before this Court is Petitioner's 2255 Petition filed November 4, 2021—which if granted by this Court would result in the vacating of Petitioner's conviction and result in the cancellation of any Restitution owed. As it stands, it is the Government that is stalling the appeal to vacate Petitioner's Restitution in this case because Petitioner has six different motions to vacate his conviction, and the Second Circuit placed Petitioner's Restitution appeal "on hold"—at the request of the Government. But in the famous case of Roy William Harris, who defrauded several banks of over $200,000,000, the Court in that case made several instructive observations:

> Restitution for victims is a mandated sentencing objective. However, it is fair to analyze that objective's application to the facts of a particular case. There are two noteworthy circumstances. First, the victims of Harris's fraud were a consortium of sophisticated international banks, advised by accountants and attorneys, whose existence and business activities survived the fraud. This does not excuse Harris's crimes against them, but the plight of the victims in this case cannot be mistaken for the devastated individual victims of schemers such as Bernard Madoff. Second, the government cannot reasonably expect to achieve during the balance of Harris's supervised release any meaningful redress of the banks' $200 million loss, as calculated in the restitution order. The impoverished Madoff victims may, through the efforts of various law enforcement and legal sources, achieve at least some measure of restitution and financial security. Keeping Harris's supervised release restitution obligation in effect until March 2012 will have no effect whatsoever upon the balance sheets of the bank victims. **The only practical consequence of continuing supervision for that purpose is to cripple Harris's efforts to achieve full rehabilitation through professional advancement.**
>
> The question posed by 18 U.S.C. § 3583(e)(1) is whether, in these circumstances, an early termination of Harris's supervised release would be "in the interest of justice." In approaching that question, I have first, as the statute commands, carefully considered the sentencing purposes set forth in § 3553(a). The magnitude of fraud and Harris's role as its architect count against him, but other sentencing purposes working in his favor tip the balance. Harris's offenses were serious but his

term of imprisonment was lengthy, in accordance with the guidelines, and just. There is no need for further general deterrence. There is no need to protect the public from Harris. The desirability of Harris's continued rehabilitation through enhanced professional opportunity trumps whatever minimal restitution might be obtained by continued supervision.

*United States v. Harris*, 689 F. Supp. 2d 692, 695–96 (S.D.N.Y. 2010).

Therefore, Restitution in this case should not be a barrier to the immediate termination of Petitioner's remaining period of supervised release.

## III.   SPECIAL CIRCUMSTANCES IN THIS CASE WARRANT GRANTING IMMEDIATE RELIEF

Aside from the various motions made to vacate his conviction, Petitioner is entitled to the same credits and treatment under the First Step Act and the CARES Act that other prisoners received. All released prisoners are entitled to ask for the termination of their period of Supervised Release after serving one year. Petitioner began his period of Supervised Release on May 8, 2021. Under the Final Rules for First Step Act Earned Time Credits released in January 2022, Petitioner is entitled to 13 months off, based on 15 days per month for 26 months of imprisonment. Petitioner always had a job in prison and was always receiving psychiatric care and was supervised by Government psychiatrists during his period in the Halfway House.

But Petitioner was meant to be at a Camp at FMC Devens, not Maximum Security at MDC Brooklyn. Without warning, Petitioner was scooped up at Devens and shipped to MDC Brooklyn over Thanksgiving in November 2019. His family did not hear from him for four days. Based on Judge Gorton's now famous formula in *United States v. Macfarlane*, 438 F.Supp.3d 125 (D.Mass. Apr. 14, 2020), each week spent in a High or Maximum-Security facility equals a month off of the traditional Camper's sentence. Just counting the weeks from December 1, 2019 to May 31, 2020 means that Petitioner is entitled to 28 months off of his "sentence" or Supervised Release, and before the Government complains yet again that Judge Gorton is wrong—the purpose of

7

reviewing the standards under 18 U.S.C 3553 is to make sure that there are no sentencing disparities between the Circuits. People who actually pleaded guilty to fraud in Boston in the "Varsity Blues" case received ridiculously low sentences when compared to Petitioner—who never pleaded guilty, who is actually innocent, and who is still trying to vacate his convictions in Boston as well as Connecticut. Similarly, the Government protested Petitioner's release under the CARES Act despite the fact that Petitioner had served over 25% of his sentence and was under 18 months to the door.

Petitioner does not want to belabor the point, because the truth of the matter is in the Docket. In the Government's last filings, they still referred to Petitioner as a danger to the Community. *See e.g.* Doc. 545 at 6. Petitioner respectfully asks the Court to grant Petitioner's 8-month-old 2255 Petition in order to hasten the Government's day of reckoning in front of Judge Underhill—a case that is a decade old and on its way to the Second Circuit for a third time.

But that is far from the only violation of the Constitution in this case. Petitioner respectfully refers the Court to the *Benatta* case, *United States v. Benatta*, 2003 WL 22202371 (W.D.N.Y. 2003), where a suspected 9-11 Terrorist had his indictment dismissed because he only spent four months at MDC Brooklyn instead of Petitioner's six months. Petitioner had to suffer through his 2016 trial at Wyatt because the Government never sent the Speedy Trial Notice required pursuant to 18 U.S.C 3161(j) to anyone at Canaan, much less than the Warden as required by law. *See* Petitioner's November 4, 2021 2255 Petitioner at pp 64-67, for an in depth discussion of *Benatta* and the Government's violation of 18 U.S.C 3161(j).

"[T]he Due Process Clause always protects defendants against fundamentally unfair treatment by the government in criminal proceedings." *United States v. Ray*, 578 F.3d 184, 199 (2d Cir. 2009), *citing Doggett v. United States,* 505 U.S. 647, 666 (1992). In *Ray*, in trying to craft a

8

remedy for the Due Process violation for the delay in Ms. Ray's case, the Second Circuit eliminated the need for her to serve any of her custodial sentence or serve her time in a Halfway House and stated the following:

> "The appropriate remedy for a proven due process violation often depends on the stage at which the violation is found and the relief sought. After a due process violation has occurred, courts endeavor to fashion relief that counteracts the prejudice caused by the violation. The Sixth Circuit has stated that suspension of the remainder of the sentence is the appropriate remedy for a due process violation.... The violation of Ray's due process right has prejudiced her insofar as a delayed custodial sentence threatens to undermine her successful rehabilitation. To remedy that harm, the appropriate relief is to release her from any requirement that she submit to a custodial sentence. Accordingly, we conclude that the appropriate remedy in this case is the vacatur of Ray's sentence insofar as it imposes a six-month term of residence in a halfway house." *Ray* at 202-03.

## IV.   PETITIONER IS ENTITLED TO RELIEF

Petitioner is an innocent man that was the victim of egregious prosecutorial misconduct detailed in two different Petitions before this Court. However, even assuming *arguendo* that Petitioner was as guilty as famous defendants Ronald Filocomo or Roy William Harris, both of whom had their periods of Supervised Release terminated by the Court, the goals of Supervised Release have been reached. He has successfully reentered Society and there is no need for the Probation Office to waste valuable time and money to supervise Petitioner. Clearly it is in the interests of justice to terminate Petitioner's period of Supervised Release—if not getting a full apology from the Government for their wrongful defamation of Petitioner over the years.

Petitioner meets all of the relevant criteria from § 3553(a) and the nine policy criteria outlined above from *Filocomo*.

But what were Petitioner's crimes? Allegedly he did not "disclose" to his investors that he was losing money during the NASDAQ Stock Market Crash of 2000—and then he allegedly lied to insurance carriers in 2007-2008 on insurance applications that he never filled out, signed, or sent in. That is it. Eventually this Court will grant relief, or the Second Circuit will grant relief

based on *United States v. Countrywide*, 822 F.3d 650 (2d Cir. 2016), or the Supreme Court will grant relief based on *Skilling v. United States*, 561 U.S. 358 (2010) and *Kelly v. United States*, 140 S.Ct. 1565, 1573-74 (2020). There is no good reason to keep "supervising" an innocent man purportedly in the interests of justice. If the Supreme Court could receive the Defendant's Writ in *Ex Parte Merryman*, 17 F. Cas. 144 (1861) on May 25, 1861, during the Civil War—and grant the Writ two days later on May 27, 1861—this Court should be able to do the same as the Pandemic is over and we are not at war.

While the Government clearly defamed and ruined Petitioner's life and there is no way for Petitioner to get back the last 20 years—Petitioner respectfully asks the Court to review what Petitioner did with his time in prison from June 2014 to May 2021. Petitioner wrote several books including writing, compiling, and editing The Prisoner of Hope Bible, that is available on Amazon—and he helped over 180 inmates with their legal work resulting in 120 of them getting out of prison early under the First Step Act and the Cares Act. This Court would be acting in the interests of justice if it granted this Petition, terminated Petitioner's remaining period of supervised Release, and then ordered the Government to respond to Petitioner's 2255 and 2241 Petitions. Once Petitioner received his law license back, he would make an excellent CJA attorney.

## CONCLUSION

Petitioner respectfully suggests that he deserves the same Due Process considerations as the defendants in *Ray* and *Benatta*, and asks only for the Court to recognize the many Due Process violations in this case and apply the Earned Time Credits of the First Step Act and Judge Gorton's calculation of time credits under *Macfarlane* to resentence Petitioner and to immediately terminate his remaining period of Supervised Release as was done by the Second Circuit in *Ray*, or to take off two years of his remaining Supervised Release as this Court did in *Page*.

Respectfully submitted,
/s/ Daniel E. Carpenter
Daniel E. Carpenter
Petitioner, *pro se*
18 Pond Side Lane
West Simsbury, CT
06092

11

## CERTIFICATION

I hereby certify that on this twenty-fifth day of May, 2022, a copy of the foregoing was filed to the Clerk of the Court. Notice of this filing was also sent by USPS First Class to AUSA Neeraj Patel 157 Church Street, 25th Floor, New Haven, CT 06510

By: /s/ Daniel E. Carpenter
Daniel E. Carpenter
Petitioner, *pro se*
18 Pond Side Lane
West Simsbury, CT. 06092